# UNITED STATES DISTRICT COURT
### for the
### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Target Device 1, an Apple iPhone, serial number<br>FFNHH76RPLJM | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:23MJ **209**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Target Device 1, an Apple iPhone, serial number FFNHH76RPLJM

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) & 846 | possession/distribution of a controlled substance |
| 18 U.S.C. 922(a)(1)(A) | unlawful dealing in firearms |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KEATON UNDERHILL
Digitally signed by KEATON UNDERHILL
Date: 2023.05.11 16:04:47 -04'00'

_____
*Applicant's signature*

Keaton Underhill, Special Agent, ATF
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 5/16/2023

_____
*Judge's signature*

City and state: Winston-Salem, North Carolina

Joi Elizabeth Peake, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Keaton Underhill, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn do depose and state the following:

## AFFIANT'S BACKGROUND & INTRODUCTION

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am employed as a Special Agent by the United States Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since January of 2022. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ATF National Academy, where I received training on firearms and narcotics investigations. During my time with ATF, I have been assigned as a Special Agent to the Greensboro, North Carolina Field Office/Charlotte Field Division. As a Special Agent, I am charged with the duties of investigating violations of the criminal laws of the United States, including investigating violations of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Importing, Manufacturing, or Dealing in Firearms without a Federal Firearms License; and 21 U.S.C § 841(a)(1) Distribution of a Controlled Substance.

3. Prior to joining the ATF, I was employed as a Uniformed Division Officer in Washington, D.C., with the United States Secret Service. Within this role, I provided protection for the White House Complex, Main Treasury Building and Annex, Foreign Diplomatic Missions,

3

and embassies in the Washington, D.C., area. Furthermore, I investigated violations and enforced laws according to United Stated Code and District of Columbia Code.

4.    I have a Bachelor of Science Degree in Criminal Justice from Emmanuel College, Georgia. The Affiant is a graduate of the Federal Law Enforcement Training Center (FLETC) Uniformed Division Training Program (UPTP), James J. Rowley Training Center Uniformed Division Training Class (UDTC), FLETC Criminal Investigator Training Program (CITP), and the ATF Special Agent Basic Training program (SABT). The curriculum of these courses included training and instruction in Federal Criminal Law, Constitutional Law, Laws of Arrest, Laws of Evidence, Search and Seizure, Criminal Investigations, D.C. State Law, and instruction in criminal investigations on the described offenses herein.

5.    Currently, I am investigating the dealing in firearms without a license by Kala Paul Rounds in the Middle District of North Carolina.  As a result of this investigation, I have probable cause to believe that Rounds, did knowingly or intentionally, engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business, transport, or receive any firearm in interstate or foreign commerce, without legally holding a Federal Firearms License required as a licensed importer, licensed manufacturer, or a licensed dealer, in violation of Title 18 § U.S.C 922(a)(1)(A).  Further, as a result of this investigation, I have probable cause to believe that ROUNDS, did knowingly or intentionally possess with the intent to manufacture, distribute, or dispense a controlled substance in violation of Title 21 U.S.C. § 841(a)(1). Further, as a result of this investigation, I have probable cause to believe that there are items and information, named and more fully described in Attachment B, that constitute evidence and fruits relating to violations of Title 18 U.S.C. § 922(a)(1)(A) and Title 21 U.S.C. § 841(a)(1).

4

4.      As a law enforcement officer, I have used and/or participated in a variety of methods investigating criminal activity, including firearm and drug related crimes, also including, but not limited to, electronic and visual surveillance, witnesses, the use of search warrants, the use of confidential informants, and the use of undercover agents.  Based on my training, experience, and participation in this investigation and other investigations involving federal firearms violations, I know:

   a.   That drug traffickers and illegal firearm dealers very often place assets, including accounts at financial institutions, in names other than their own to avoid detection of these assets by government or other law enforcement agencies;

   b.   That even though these assets are in other persons' names, the drug traffickers and illegal firearms dealers continue to use these assets and exercise dominion and control over them;

   c.   That drug traffickers and illegal firearms dealers must maintain on hand large amounts of cash in order to maintain and finance their on-going narcotics and illegal firearms dealing business.  Drug traffickers and illegal firearms dealers often carry and use firearms in order to protect their narcotics, firearms and money;

   d.   That drug traffickers and illegal firearms dealers may maintain books, records, receipts, notes, ledgers, computers and computer disks, airline tickets, money orders,

5

cashier check receipts, automobile rental car records, photographs, and other papers

relating to the transportation, ordering, sale and distribution of narcotics and firearms;

e.   That persons who deal in narcotics and illegal firearms are not unlike any other

individual in our society in that they maintain documents and records.  These

documents and records will normally be retained for long periods of time regardless

of whether their value to the individual has diminished.  Often times, this type of

evidence is generated, maintained, and subsequently forgotten.  Hence, documents

that one would normally think a prudent person would destroy because of the

incriminating nature of the documents are kept.  In fact, I have participated in the

execution of search warrants where documentary evidence dating back years has been

found.  It is also my experience that the larger, more complex a continuing criminal

enterprise is, the more documentary evidence is generated during the course of

commission.

f.   That it is common for drug traffickers and illegal firearms dealers to secrete

contraband, proceeds of narcotics and illegal firearms sales, and records of narcotics

and firearm sales transactions in secure locations within their residences, businesses,

safe deposit boxes, and obscure locations known only to them, i.e. mail drops, mini

storage warehouses, etc., for ready access and to conceal them from law enforcement

authorities;

6

g.  That persons involved in drug trafficking and illegal firearms dealing conceal in their residences, businesses, safe deposits boxes, obscure locations, and vehicles, caches of firearms, large amounts of currency, financial instruments, precious metals, jewelry, personal effects, coin collections, and other items of value representing the proceeds of illegal narcotics sales and firearms dealings; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking and illegal firearms dealing activities;

h.  That drug traffickers and illegal firearms dealers often purchase expensive vehicles and residences with the proceeds from their narcotics and firearm dealing transactions;

i.  That when drug traffickers and illegal firearms dealers amass proceeds from the sale of narcotics or firearms, they often attempt to legitimize these profits.  I know that to accomplish this goal, drug traffickers and illegal firearms dealers utilize including, but not limited to, foreign and domestic banks and their attendant services, securities, credit cards, cashier's checks, money orders, bank drafts, letters of credit, brokerage houses, trusts, partnerships, shell corporations and business fronts;

j.  That drug traffickers, illegal firearms dealers and persons engaged in firearms offenses commonly maintain addresses or telephone numbers in cellular telephones, books, or papers which reflect the names, addresses and/or telephone numbers for their associates in the organization;

7

k.  That drug traffickers, illegal firearms dealers and persons engaged in firearms offenses take, or cause to be taken, photographs of themselves, their associates, their properties, their products, and their firearms, and these persons maintain these photographs and video;

l.  That in addition to narcotics and firearms, drug traffickers and illegal dealers usually keep paraphernalia and accessories for their narcotics and firearms.  Drug traffickers usually keep paraphernalia for manufacturing, cutting, packaging, weighing and distributing their drugs.  This paraphernalia includes but is not limited to, scales, plastic bags, rubber gloves, heat sealers, and vacuum sealers; Firearm traffickers usually keep paraphernalia and accessories, which can include but are not limited to, original firearms boxes, ammunition, magazines, various accessories; and

m.  That the Net Worth and/or Source and Application of funds analysis can be used to show that a suspect's known expenditures and/or accumulation of assets substantially exceed his legitimate sources of income, which in turn may be used to prove that the suspect is engaged in illegal money generating activities, such as drug trafficking, illegal dealing in firearms or fraud.  The Net Worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal enterprise, to his/her net worth at the approximate time of his/her arrest.  The Source and Application of funds analysis focuses on the suspect's expenditures during the period of the purported illegal

8

activities and compares such expenditures with his legitimate sources of income. Both analyses require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (one year).

n.  That other than assisting in the net worth/source and application of funds analysis, a financial profile of a suspect prior to the purported criminal activity evidences changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity that are consistent with a person generating income from illegal activities (e.g., drug trafficking, illegal firearms dealing or fraud), as compared to a person earning income from legitimate sources. Evidence of a defendant's expenditures, asset accumulation, financial lifestyle, net worth/source and application of funds analysis, and underlying financial documents necessary for such analysis are admissible evidence under federal case law in drug trafficking, firearms dealing and money laundering cases. Thus, there is a need for such documents to be taken during the execution of a search warrant.

o.  That the practice of receiving cash or other monetary instruments and holding this receipt to be a repayment of a prior loan and the wiring of money in nominee names through businesses such as Western Union or American Express MoneyGram, as opposed to utilizing the services available from mainstream financial institutions such

9

as a bank, credit union, or savings and loan, are common tools utilized by illegal drug traffickers and illegal firearms dealers;

p. That illegal dealers of firearms attempt to hide and conceal their true identity to the secondary purchaser or possessor of the firearms. In attempting to do so, the illegal firearms dealer will sometimes use fictitious names when purchasing or selling firearms or use a relative, girlfriend or boyfriend, or associate to purchase, acquire, or send the firearm(s);

q. Most persons who own, possess, acquire or maintain firearms whether prohibited or not, keep and store firearms, ammunition, gun parts, gun-cleaning kits, holsters, ammunition belts, original box-packaging, targets, expended pieces of lead and bullet loading equipment either in their residence, storage building, or storage shed;

r. Firearms are often indicia of drug trafficking and illegal firearms dealing since possession of a firearm tends to demonstrate likelihood that the dealer took steps to prevent other narcotics and firearm inventory, ammunition, paraphernalia, accessories and proceeds from being stolen;

5. On the basis of the entire contents of this affidavit, I believe there is probable cause for the issuance of search/seizure warrants for the **Target Device 1** described herein in Attachment A, for the purpose of searching and the seizure of physical evidence relating to the above-referenced offenses, including contraband and assets used in or derived from the on-going

10

criminal enterprise described in this affidavit, and the instrumentalities for the commission of the offense referenced herein *i.e.*, firearms and narcotics trafficking.

6.  The statements contained in this affidavit are based in part upon my experience, knowledge of the facts and circumstances surrounding this investigation, and on information provided to me by other law enforcement personnel and agencies.

7.  I have fully participated in the investigation of the offenses listed below. As a result of my personal participation in this investigation, which includes, but is not limited to, the utilization of ATF and other law enforcement databases, use of confidential sources, interviews of cooperating defendants and witnesses, physical and electronic surveillance, and examination of reports submitted by other Special Agents and investigators, I am familiar with all aspects of this investigation.

8.  On the basis of this familiarity, I allege that the information in this affidavit shows there is probable cause to believe that Rounds, and other persons as yet unknown, have committed and are committing violations of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Importing, Manufacturing, or Dealing in Firearms without a Federal Firearms License; and 21 U.S.C § 841(a)(1): Distribution of a Controlled Substance.

9.  I have not listed all the facts regarding the illegal firearms dealing activities of the person named herein, but I have set forth facts that I believe sufficiently establish probable cause to support the issuance of a search warrant for the property listed within the body of this affidavit and in Attachment A. The facts to support a finding of probable cause are as follows:

## FACTS SUPPORTING PROBABLE CAUSE

11

10.     In and around March of 2023 through ATF intelligence queries, your Affiant became aware of the suspected firearms trafficking and the straw purchasing of firearms by Kala Paul ROUNDS (hereinafter "**ROUNDS**") in and around the Greensboro, North Carolina area. Between November 2021 and July 2022, ROUNDS purchased approximately forty-nine firearms from multiple Federal Firearms Licensees (FFLs), three of which had been recovered in various crimes throughout North Carolina. The time-to-crime variance on these three firearms are as follows: 170 days, 122 days, and 72 days. I am familiar with the various trends and signs surrounding straw purchasing, illicit firearms dealing, and firearms trafficking; one of which includes a lower time-to-crime period, as firearms are purchased legally and then immediately diverted to the illegal secondary market where they will be used in criminal activity. The term "time-to-crime" is the date from which a firearm is purchased or obtained, until the time that the firearm is recovered by law enforcement in a crime.

11.     I ultimately learned that during July of 2022, ATF Special Agent Mike Newsome became aware of possible straw purchasing and firearms trafficking activity associated with ROUNDS. Multiple Sale Reports associated with ROUNDS indicated that ROUNDS had purchased numerous firearms, often of the same make, model and caliber, from various FFLs during 2021 and 2022. Multiple Sales Reports are required to be generated by FFLs when an individual purchases two or more firearms within five business days. During this period, approximately three of ROUNDS' firearms had been recovered in various criminal activities. Special Agent Newsome subsequently conducted an interview of ROUNDS on July 6, 2022. During the interview, ROUNDS alleged that some of the firearms had been stolen, resulting in their recovery in crimes. Special Agent Newsome informed ROUNDS that he was required to obtain his license to become an FFL if he wished to engage in the business of dealing firearms

12

legally. ROUNDS possesses a valid North Carolina Concealed Carry Permit through the Gaston County Sheriff's Office (#30886690NC), which ROUNDS utilizes to conduct his firearm purchases. ROUNDS acknowledged that he understood but further denied that he was selling firearms illegally. ROUNDS was also verbally warned by Special Agent Newsome to cease any further illegal sales of firearms. It should be noted ROUNDS had not previously reported to law enforcement that any of his firearms had been stolen.

12.      Following the initial warning, Special Agent Newsome noticed a significant decline in the number of Multiple Sales Reports associated with ROUNDS. However, over the course of the following months, firearms traced to ROUNDS continued to be recovered by various law enforcement agencies with short time-to-crime variables. It was at this point that I then opened a criminal investigation on ROUNDS, and began compiling data on previous purchases, recoveries, and other pertinent intelligence. I was able to identify approximately forty-four more firearms that were purchased by ROUNDS since his interview and warning with Special Agent Newsome on July 6, 2022. Since this warning, an additional eleven firearms originally purchased by ROUNDS have been recovered by law enforcement. In total, fourteen firearms purchased by ROUNDS have been recovered by law enforcement at the time of this affidavit. Those recoveries are listed below:

- ATF Firearms Trace Summary (T20220200921), which shows the recovery of a Taurus, model G3C, 9mm Pistol by the Greensboro Police Department on April 2, 2022. This firearm was purchased by ROUNDS on December 1, 2021. The total time to crime was: 122 days.

13

- ATF Firearms Trace Summary (T20220344505), which shows the recovery of a SCCY, model CPX-1, 9mm Pistol by the Greensboro Police Department on May 28, 2022. This firearm was purchased by ROUNDS on December 9, 2021. The total time to crime was: 170 days.

- ATF Firearms Trace Summary (T20220361510), which shows the recovery of a Glock, model 27, .40 caliber Pistol by the Greensboro Police Department on June 16, 2022. This firearm was purchased by ROUNDS on April 5, 2022. The total time to crime was: 72 days.

- ATF Firearms Trace Summary (T20220408825), which shows the recovery of a Glock, model 43, 9mm Pistol by the Burlington Police Department on August 16, 2022. This firearm was purchased by ROUNDS on May 3, 2022. The total time to crime was: 105 days.

- ATF Firearms Trace Summary (T20220486465), which shows the recovery of a Glock, model 42, .380 caliber Pistol by the Mooresville Police Department on September 25, 2022. This firearm was purchased by ROUNDS on July 30, 2022. The total time to crime was: 57 days.

- ATF Firearms Trace Summary (T20230151878), which shows the recovery of a Glock, model 19, 9mm Pistol by the Kannapolis Police Department on October

14

31, 2022. This firearm was purchased by ROUNDS on September 27, 2022. The total time to crime was: 34 days.

- ATF Firearms Trace Summary (T20220590229), which shows the recovery of a Glock, model 29, 10mm Pistol by the Huntersville Police Department on December 4, 2022. This firearm was purchased by ROUNDS on July 7, 2022. The total time to crime was: 154 days.

- ATF Firearms Trace Summary (T20230053133), which shows the recovery of a Taurus, model G2C, 9mm Pistol by the Greensboro Police Department on January 19, 2023. This firearm was purchased by ROUNDS on November 15, 2021. The total time to crime was: 430 days.

- ATF Firearms Trace Summary (T20230147842), which shows the recovery of a Diamondback, model DB380, .380 caliber Pistol by the High Point Police Department on December 12, 2022. This firearm was purchased by ROUNDS on August 15, 2022. The total time to crime was: 119 days.

- ATF Firearms Trace Summary (T20230144488), which shows the recovery of a Glock, model 22, .40 caliber Pistol by the Guilford County Sheriff's Office on March 12, 2023. This firearm was purchased by ROUNDS on August 27, 2022.

15

The total time to crime was: 197 days. This firearm was linked to a shooting event on October 31, 2022.

- ATF Firearms Trace Summary (T20230144483), which shows the recovery of a American Tactical, model Omni-Hybrid, .223 caliber Pistol by the Guilford County Sheriff's Office on March 12, 2023. This firearm was purchased by ROUNDS on September 13, 2022. The total time to crime was: 180 days. This firearm was linked to a shooting event on February 24, 2023.

- ATF Firearms Trace Summary (T20230177198), which shows the recovery of a Ruger, model Ruger 5-7, .57 caliber Pistol by the Anne Arundel County Police Department on April 5, 2023. This firearm was purchased by ROUNDS on February 7, 2023. The total time to crime was: 57 days. This firearm was linked to a murder-suicide on April 5, 2023.

- ATF Firearms Trace Summary (T20230180343), which shows the recovery of a Romarm-Cugir, model Mini Draco, 7.62 caliber Pistol by the Greensboro Police Department on April 7, 2023. This firearm was purchased by ROUNDS on January 30, 2023. The total time to crime was: 67 days.

- ATF Firearms Trace Summary (T20230192290), which shows the recovery of a Taurus, model PT140 G2A, .40 caliber Pistol by the Greensboro Police

16

Department on April 12, 2023. This firearm was purchased by ROUNDS on April 12, 2023. The total time to crime was: 0 days.

A query of ROUNDS' criminal history yielded negative results, and ROUNDS is not prohibited by state or federal law from purchasing, possessing, or carrying firearms.

13.     Throughout the course of this investigation, I have been able to determine that ROUNDS has purchased approximately ninety-three total firearms from November 2021 to present day.



ROUNDS Driver's License Picture

17

14.     On April 12, 2023, ATF Special Agents received information from a cooperating source (CS) that ROUNDS was actively in the process of purchasing firearms at Gate City Pawn, LLC, an FFL located at 3800 W. Gate City Boulevard, Greensboro, North Carolina. This CS has provided information in the past on multiple occasions, which has been corroborated and proven to be reliable. The CS stated that ROUNDS was seeking to purchase both a Taurus, model G2C, .40 caliber Pistol, as well as a Glock, model 45, 9mm Pistol. The CS additionally mentioned that ROUNDS stated that he was in a rush during the purchase, although the reason was unknown. ATF Special Agents and Greensboro Police Department units arrived in the area of Gate City Pawn, and upon visually confirming that ROUNDS' vehicle was present at the store (Grey in color 2017 Ford Focus, NC JFJ-4426) began immediate surveillance on ROUNDS. I conducted intelligence queries which showed this vehicle is currently registered to ROUNDS. Moments later, ROUNDS emerged from Gate City Pawn, entered his vehicle, and exited the parking lot. Surveillance units observed ROUNDS to be by himself during the transaction. Surveillance units then observed ROUNDS immediately enter the next parking lot, where ROUNDS then parked behind the Cook-Out restaurant and made contact with two individuals in a white sedan. It should be noted that the parking lot that ROUNDS relocated to is directly next to Gate City Pawn. Surveillance then observed the two unidentified individuals enter ROUNDS' vehicle. Shortly after, the unidentified individuals exited ROUNDS' vehicle, re-entered their own vehicle, and both vehicles departed from the rear of the parking lot. ATF surveillance units attempted to follow ROUNDS after the transaction, however traffic impeded units from continuing surveillance on ROUNDS' vehicle. Greensboro Police Department units were immediately able to conduct a traffic stop in the area of 4407 W. Gate City Boulevard on the white sedan that had met with ROUNDS.

18

15.    Subsequent to the traffic stop of the white sedan, both occupants of the vehicle were detained while officers conducted a search of the vehicle. The driver was identified as Jamerun Markiest DUDLEY (B/M DOB: 12/02/1997). The passenger of the vehicle was identified as Joshua Louis GUTIERREZ (H/M DOB: 10/26/2003). During a search of the vehicle, officers located a small amount of marijuana as well as two firearms: a Smith & Wesson, model M&P 9, 9mm Pistol, S/N MRH5545; and a Taurus, model PT140 G2A, .40 caliber Pistol, S/N AEC144090. I immediately obtained the ATF Form 4473 that correlated with the purchase from Gate City Pawn, which stated that Kala Paul ROUNDS had purchased two firearms on the same date: a Glock, model 45, 9mm Pistol, S/N AHLB220, as well as a Taurus, model PT140 G2A, .40 caliber Pistol, S/N AEC144090. I then confirmed that the Taurus firearm found in the vehicle was the same Taurus firearm that ROUNDS had purchased only moments prior.

16.    Upon transport to the Greensboro Police Department, both DUDLEY and GUTIERREZ were interviewed by ATF Special Agents. Special Agent Paul Johnson and myself began the interview by advising GUTIERREZ of his *Miranda* Rights. GUTIERREZ stated and signed that he understood these rights and agreed to speak with us. I asked GUTIERREZ for his account of what he had done with DUDLEY leading up to the arrest. GUTIERREZ stated that both he and DUDLEY had driven to a temporary work agency to submit applications earlier in the day. GUTIERREZ stated that he works with DUDLEY at the Harris Teeter Distribution Center in Greensboro, North Carolina. GUTIERREZ stated that he and DUDLEY then had met with a male individual he knows as "JT" to purchase a firearm, prior to the arrest. GUTIERREZ stated that he had met "JT" previously through a work associate named "Raheem", which took place via FaceTime, and that "JT" was known to sell firearms and marijuana in the Greensboro

19

area. GUTIERREZ advised that "Raheem" is also currently employed with GUTIERREZ at the Harris Teeter Distribution Center located in Greensboro, North Carolina, and that he is unsure what "Raheem's" last name is. GUTIERREZ further elaborated that "Raheem" had stated that "JT" sells firearms, but that the firearm purchases are made under "JT's" name. GUTIERREZ stated that "Raheem" has purchased approximately five firearms from "JT" previously. GUTIERREZ mentioned that "JT" gets new firearms every week, and "Raheem" was able to provide the phone number for "JT" to GUTIERREZ. GUTIERREZ stated that he had contacted "JT" regarding buying a firearm, and that "JT" had mentioned that he had a Taurus handgun for sale for approximately $450. When asked about the Smith & Wesson, model M&P 9, 9mm Pistol that had also been recovered from DUDLEY's vehicle, GUTIERREZ initially told Special Agents that it was not his firearm, nor did he know it was in the vehicle. However, GUTIERREZ later admitted that it was in fact his firearm, and that he planned on selling it after obtaining the Taurus, model PT140 G2A, .40 caliber Pistol from "JT". GUTIERREZ additionally stated that his fingerprints would be on the firearm, if examined.

17.    GUTIERREZ also stated that he has heard "JT" sells high quality marijuana but has never purchased marijuana from "JT" before. GUTIERREZ stated that "JT" sells "zips" for $180 and has sent GUTIERREZ pictures of the marijuana before. I am familiar with the term "zip" to be a slang unit of measurement for narcotics purchases, in which the term "zip" is used to represent one ounce, or 28 grams, of narcotics substance. Prior to the purchase, GUTIERREZ stated that "JT" had contacted him via text message and instructed GUTIERREZ to meet behind the Cook-Out restaurant located at 3804 West Gate City Boulevard in Greensboro, North Carolina. It should be noted that the Cook-Out restaurant is located directly beside Gate City Pawn, which is where the firearm was purchased only moments before the transaction with

20

GUTIERREZ, DUDLEY, and "JT". GUTIERREZ and DUDLEY arrived to the Cook-Out in

DUDLEY's vehicle, where GUTIERREZ observed "JT" pull into the parking lot. When asked

what vehicle "JT" was driving during the transaction, GUTIERREZ stated that it was possibly a

gray in color Nissan. Upon entering "JT's" vehicle, GUTIERREZ also observed "JT" to be

armed with a handgun throughout the transaction, which he believed "JT" carried for protection.

GUTIERREZ stated that he paid "JT" for the firearm in cash, and then exited "JT's" vehicle and

re-entered DUDLEY's vehicle. I asked GUTIERREZ if he would give consent to search his cell

phone, to which GUTIERREZ consented. GUTIERREZ signed an ATF Form 3220.11 and

provided the passcode to his red in color Apple iPhone which was "674000".

    18.    ATF Special Agent Ben Crocker and Special Agent Mike Newsome then

conducted an interview of DUDLEY. Special Agents Crocker and Newsome began the interview

by advising DUDLEY of his *Miranda* Rights. DUDLEY stated and signed that he understood

these rights and agreed to speak with Special Agents Crocker and Newsome. DUDLEY stated

that the vehicle that both him and GUTIERREZ had been arrested in that day (white in color Kia

sedan) belongs to him, and that DUDLEY had owned it for approximately 2-3 months.

DUDLEY stated that he works with GUTIERREZ at the Harris Teeter Distribution Center in

Greensboro and has known GUTIERREZ for approximately three weeks. DUDLEY stated that

earlier in the day he had picked up GUTIERREZ from GUTIERREZ's grandmothers house

around 2:00PM, and both DUDLEY and GUTIERREZ had visited a local temporary

employment agency to obtain employment. DUDLEY then stated that the two had stopped at a

local smoke shop before meeting with "KD" at the Cook-Out to purchase marijuana. I believe

"JT" and "KD" to be one in the same individual, and that GUTIERREZ had possibly misheard

the nickname for the individual they had met with to purchase the firearm and marijuana.

DUDLEY then stated that "KD" arrived at the back of the parking lot behind the Cook-Out in a grey Ford sedan, and that both himself and GUTIERREZ then entered "KD's" vehicle, with DUDLEY entering the backseat. DUDLEY explained that once inside "KD's" vehicle, GUTIERREZ then handed cash to "KD" in exchange for a firearm. DUDLEY explained that he also purchased marijuana from "KD" while in the vehicle, which he spent approximately $50.00 via Apple Pay for ¼ ounce of marijuana from "KD". DUDLEY stated that "KD" was a black male, and that he had seen the same grey Ford that KD was driving today around Greensboro, as well as at DUDLEY's old apartment building. DUDLEY additionally explained that he had previously purchased a used Taurus 9mm handgun from "KD" for $300.00, but ultimately gave it back to "KD" as DUDLEY's girlfriend was not comfortable with DUDLEY owning a firearm. DUDLEY identified the phone number for "KD" as 704-675-6451 which was listed in DUDLEY's contact list as "Lil Bro KD". This was the same number that SA Newsome had used to contact ROUNDS in July of 2022. DUDLEY stated that his own current phone number is 336-947-0574, and DUDLEY consented to a search and extraction of his cell phone data. He supplied the password to Special Agents Crocker and Newsome as "256101".

19.     Following the interviews of DUDLEY and GUTIERREZ, I provided the Greensboro Police Department with both Apple iPhones for a data extraction to be conducted. After the successful extraction, I observed numerous text message conversations between GUTIERREZ and an individual with the cell phone number 704-675-6451 (identified by DUDLEY as ROUNDS' phone number). In the conversations, ROUNDS sent multiple photo images of firearms, along with their caliber and a price for each. It should be noted that I verified that this phone number was the same phone number that Special Agent Newsome had previously used to contact ROUNDS regarding the interview that was conducted in July 2022.

22







20.     Both GUTIERREZ and ROUNDS discuss the pricing of a Taurus firearm that GUTIERREZ wishes to purchase from ROUNDS for $350.00, with ROUNDS explaining that "It's not gonna be $350 tho because I charge to go get the guns out the store". GUTIERREZ then

23

asks ROUNDS "Shi I'll do that what's da price gang", to which ROUNDS replies, "Idk whatever I get it for out the store…Plus like $85."



Text messages from ROUNDS to GUTIERREZ on April 12, 2023, show ROUNDS directing GUTIERREZ to the Cook-Out located on West Gate City Boulevard in Greensboro. ROUNDS advises GUTIERREZ that he is in the store doing paperwork, and further tells GUTIERREZ that "When I pull up just get in the passenger seat".

24



21.     During a review of extracted data from DUDLEY's cellular device, numerous

photos of evidentiary value were discovered within a text conversation between

DUDLEY and an individual identified as "Lil Bro KD" (identified as ROUNDS). Images of various caliber firearms were observed being sent from ROUNDS to DUDLEY, with each firearm price and accessories included in the photos. It should be noted that these firearms match the make, model and calibers of firearms previously purchased by ROUNDS.



Additionally, ROUNDS sent DUDLEY numerous messages containing his current inventory and pricing of marijuana.



Lastly, an image of an Apple Payment from DUDLEY to ROUNDS was observed within text messages. The time stamp on the payment shows April 12, 2023, at approximately 3:01PM, which is moments before both DUDLEY and GUTIERREZ were arrested. This payment matches DUDLEY's statement that Apple Pay was used for the transaction for marijuana from ROUNDS while DUDLEY and GUTIERREZ were in ROUNDS' vehicle.

27



20.     Database queries I conducted indicate that ROUNDS currently resides at 3604 Hewitt Street, Unit 1-C, Greensboro, North Carolina. The residence appears to be an apartment-style, off-campus student housing complex. Surveillance conducted by ATF Special Agent Eli Carpenter on April 13, 2023, showed ROUNDS vehicle parked in front of 3608 Hewitt Street (adjacent building). I reviewed a Greensboro Police Department Incident Report from November 2022, in which ROUNDS was the reporting party of a domestic disturbance within his apartment, which was identified as 3604 Hewitt Street, Unit 1-C, Greensboro, North Carolina. On April 17, 2023, I obtained tenant rosters for 3604 Hewitt Street and 3608 Hewitt Street (also known as The Letterman Off-Campus Student Housing) through a Grand Jury Subpoena. These rosters listed Kala Paul ROUNDS as a tenant within 3608 Hewitt Street (Building 6), Apartment 1-C, Greensboro, North Carolina. Additionally, the rosters show that ROUNDS moved into 3608 Hewitt Street, Unit 1-C on February 1st, 2023. On April 18, 2023, ATF Special Agent Shaun Hunter made contact with the tenant inside of 3608 Hewitt Street, Unit 1-C, to which Special

28

Agent Hunter made positive identification that ROUNDS had answered the door to the residence. During this contact, I observed ROUNDS' vehicle parked directly in front of 3608 Hewitt Street, Unit 1-C.

21. On April 26, 2023, Special Agents and Task Force Officers with the ATF exercised a Federal Search and Arrest warrant on Kala Paul ROUNDS at his residence listed as 3608 Hewitt Street, Apartment 1-C, Greensboro, North Carolina. ROUNDS was taken into custody without incident, and a subsequent search warrant conducted on the residence and ROUNDS' vehicle yielded numerous items of evidentiary value to include:

1. Glock, model 42, .380 caliber, Pistol

2. Derya Arms, model VR-80, 12-gauge, Shotgun

3. (3) Apple iPhones

4. Marijuana and associated paraphernalia

5. Assorted firearm ammunition

6. Approximately $6,000 U.S. Currency

7. Scales for weighing marijuana

8. Cash box with receipts from firearms dealers

9. Receipts from firearms dealers (located in vehicle)

10. Ledger

11. Firearm magazines (Residence and vehicle)

22. A custodial interview with ROUNDS was conducted immediately following his arrest and took place at the Greensboro Police Department located at 1106 Maple Street, Greensboro, North Carolina. This interview was recorded with the use of an audio/video recording device. The interview recording will be submitted into evidence pending future court proceedings. The

29

following is a synopsis of the information provided by ROUNDS during the interview. Upon

initiating the interview, ROUNDS was read and advised of his *Miranda* Rights to which

ROUNDS stated and signed that he understood these rights and agreed to speak to ATF SAs

Keaton Underhill, Shaun Hunter, and Mike Newsome without an attorney present. SA Newsome

asked ROUNDS about a second black Apple iPhone (**TARGET DEVICE** 1 bearing serial

number FFNHH76RPLJM),  found within ROUNDS' residence, to which ROUNDS stated that

phone was for "making small plays… that's about it." ROUNDS further elaborated that he used

**TARGET DEVICE 1** for marijuana sales and denied a consent search of **TARGET DEVICE 1**

by stating "nah not really … only because I've got other stuff in there too." SA Newsome

questioned ROUNDS as to how much marijuana he receives on a weekly basis, to which

ROUNDS stated he obtains approximately a quarter pound every week.

## **CONCLUSION**

Based on the preceding information, there is probable cause to believe that the named items and information more fully described in Attachment B, constituting evidence or fruits of violations of Title 18 USC § 922(a)(1)(A) and 21 U.S.C. § 841(a)(1) will be found in the **TARGET DEVICE 1** more fully described in Attachment A.


/S/ Keaton Underhill
Keaton Underhill, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives


Dated: May 16, 2023

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.


Honorable Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

31

<u>**ATTACHMENT A**</u>

The property to be searched is as follows:

    a. **TARGET DEVICE 1**: a black Apple iPhone SE, Serial No: FFNHH76RPLJM in a black protective case. The **TARGET DEVICE** is currently located at the ATF office in Greensboro, NC. The assigned telephone number is unknown at this time.



This warrant authorizes the forensic examination of the **TARGET DEVICE 1** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the **TARGET DEVICE 1** described in Attachment A that relate to violations of Title 18 USC § 922(a)(1)(A) Unlawful Dealing in Firearms and Title 21 USC § 841(a)(1), Possession with Intent to Distribute a Controlled Substance (Marijuana), and involve Kala ROUNDS as follows:

    a.    Electronic communications between ROUNDS and co-conspirators;

    b.    lists of customers and related identifying information;

    c.    types, amounts, and prices of marijuana trafficked as well as dates, places, and amounts of specific transactions;

    d.    types, amounts, and prices of firearms trafficked as well as dates, places, and amounts of specific transactions

    e.    Information related to sources of marijuana (including names, addresses, phone numbers, or any other identifying information);

    f.    all bank records, checks, credit card bills, account information, and other financial records.

2.    Evidence of user attribution showing who used or owned the **TARGET DEVICE 1** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2